AMERICAN GENERAL INSURANCE COMPANY

v.

Mrs. Irene E. COLEMAN et al.

No. 6016.

Court of Civil Appeals of Texas.

Beaumont.

Nov. 28, 1956.

Rehearing Denied Dec. 27, 1956.

Collins, Garrison, Renfrow & Zeleskey, Lufkin, for appellants.

Bates & Cartwright, Houston, for appellee.

ANDERSON, Justice.

Robert W. Coleman having died as the result of burns he received December 5, 1954, when his jeep overturned on a public highway and caught on fire, his widow and his minor daughter brought this suit to recover under the Workmen's Compensation Act, Vernon's Ann.Civ.St. art. 8306 et seq., for his death, alleging that at the time of the accident the deceased was in the employ of Brown & Root, Inc., and acting in the course of his employment. The defendant primarily defended on the theory that the employer-employee relationship that admittedly existed for a time between Brown & Root, Inc., and the deceased had been terminated prior to the happening of the accident. Alternatively, it defended on the theory that in any event the deceased did not receive his injuries in the course of his employment. The case was submitted to a jury on a single special issue, the following: "Do you find from a preponderance of the evidence that the injuries of Robert W. Coleman on December 5, 1954, were sustained by him in the course of his employment for Brown & Root, Inc.?" The jury answered in the affirmative, judgment was rendered in favor of the plaintiffs, and the defendant appealed.

During the time he is conceded to have worked for Brown & Root, Inc., the deceased operated one of that company's draglines at a site that was situated about seventeen miles from Jacksonville, Texas. His pay was computed on an hourly basis; his working day commenced at 7:00 a. m. and continued for ten hours; he worked seven days per week; and a new working week or pay period commenced each Sunday.

The deceased was hired either at Jacksonville or at the job site, but had been previously notified in Houston by one of Brown & Root's timekeepers that a dragline operator was needed on what we shall refer to as the Jacksonville job. At the time of going to apply for employment, the deceased, a professional dragline operator, drove from Houston in his own jeep, carrying with him two large mechanical jacks, a variety of mechanic's tools, three or four five-gallon cans that he used as gasoline cans, and some oil cans. He owned all of these items and customarily took them with him to any job on which he worked. Having been given employment, the deceased regularly used his jeep as a means of transportation between his place of abode in Jacksonville and the job site, and also as a means of keeping available to himself while on the job his aforesaid tools and limited quantities of gasoline and oil. He used the tools, when the need arose, in repairing and adjusting the dragline he operated; the oil for lubricating the dragline; and the gasoline for cleaning the machinery and for supplying a small gasoline motor that was used to start the operating motor of the dragline. The deceased made these uses of his jeep, tools and equipment with the knowledge and acquiescence of his employer, but appears to have made them as a matter of personal preference and convenience rather than because his employer required or expected him to do so. He neither received nor apparently expected extra compensation for doing so.

The work the deceased was to do at the Jacksonville job site was completed at about 10:30 or 11.00 a. m. on the day of the accident (December 5, 1954), which was a Sunday and the first day of the pay period ending December 11, 1954. The deceased was thereupon given a pay check, to which was attached a "Statement of Earnings and Deductions," and at the same time, following the words "Received Payment," he signed his name at the bottom of an instru-

ment that bore the heading, "Termination & Time Order." The latter instrument, a printed form, was marked above both the signature of the deceased and that of F. E. Schoolcraft, who was foreman of the job, in such manner as to show the deceased discharged as of December 5, 1954, but at no specific hour or time of the day. It also stated in its face that "For Hours and at Rate Shown during Pay Period Ending: 12–11–54" the deceased was entitled to pay for ten hours at the rate of $2.25 per hour; this, despite the fact that, up until the time he completed the work he was to do, the deceased had worked no more than four or four and a half hours during that pay period. The "Statement of Earnings and Deductions" that was attached to deceased's pay check showed on its face that the check was given in payment for ten hours during the pay period ending December 11, 1954. The plaintiffs introduced in evidence the check and the "Statement of Earnings and Deductions," or, to be more exact, copies of a check and voucher that were issued by Brown & Root, Inc., to replace the originals, the originals having been destroyed in the accident, and the defendant introduced the "Termination & Time Order." The plaintiffs also introduced in evidence copies of a check and voucher that were issued by Brown & Root, Inc., to replace the originals that were issued to the deceased for the pay period ending December 4, 1954. The check, as reflected by the voucher, was given in payment for seventy hours of work.

The foreman who approved the "Termination & Time Order," F. E. Schoolcraft, having been called by the defendant as a witness, testified that the deceased was discharged as of the time he (the deceased) completed his work and received his pay check, and that the deceased was thereupon free, insofar as Brown & Root, Inc., was concerned, to go wherever he pleased, to travel by any means he pleased, and to do whatever he pleased. He also testified that during the week preceding the day of the accident, the deceased, of

his own volition and in an unsuccessful effort to finish his work in time to go home on Saturday, put in considerable overtime that was not kept accurate account of and for which the deceased was not entitled to draw overtime pay, and that it was because of this fact that the deceased was allowed pay for ten hours of work during the pay period ending December 11, 1954. He said that he and the deceased estimated the overtime the deceased had put in and concluded that it, together with the time the deceased worked on Sunday, was sufficient to make out a full day.

The accident happened about 2:00 p. m., near the southern boundary of Polk County, or at a distance of a hundred miles or more from the Jacksonville job site. The deceased was driving toward Houston, where both his home and the home office of Brown & Root, Inc., were situated. He still had with him in his jeep the tools and cans that have already been mentioned; and the evidence would perhaps support an inference that there was gasoline in one or more of the gasoline cans, and oil in the oil cans, though there was no direct evidence to this effect. If there was gasoline in any of the cans, it had probably been supplied by Brown & Root, Inc.

The deceased suffered third degree burns over virtually his entire body, but nevertheless lived until about nine o'clock that night. He was taken to the Polk County Hospital in Livingston and was there attended by Dr. James H. Dameron. The doctor was called by plaintiffs as a witness and was permitted to testify, over defendant's objections, to a conversation he had with the deceased while the latter was in the hospital. In pertinent part, his testimony was as follows:

### Direct.

"Q. Tell us, Doctor, if you will, what, if anything, Mr. Coleman told you with reference to where he was going at the time the collision took place? A. He told me he was going from Jacksonville to Houston,

that he was driving a Brown & Root jeep, and that he was being transferred, going to be transferred to another job. That is all he told me.

"Q. He told you that he was going to Houston to another job? A. Yes, being transferred to another job.

"Q. He told you he was going from Jacksonville to Houston? A. Yes, sir, somewhere in the area of Jacksonville.

"Q. Did he give you the name of—did he tell you the name of anyone whom he represented to you was with Brown & Root and ask you to telephone them? A. Yes; I didn't do the telephoning, but he gave me the telephone number.

"Q. Did he identify this person? A. Yes.

"Q. What capacity did he say he had? A. He said it was his foreman.

"Q. What, if anything, did he ask you to do? A. He asked me to 'phone' his wife. He gave me his wife's telephone number and the other telephone number. I gave the number he said belonged to his foreman to someone else. I 'phoned' his wife, however, personally.

"Q. And he gave you his foreman's number and asked you to call his foreman? A. Yes, sir.

"Q. What did he ask you to tell his foreman? A. That he had a wreck and was in very serious condition. He knew that because he asked me, and I told him definitely what condition he was in."

The only other evidence worthy of note was supplied by the testimony of Mrs. Coleman, one of the plaintiffs, who testified that her husband had worked for Brown & Root, Inc., off and on over a period of several years, mostly in Texas and Louisiana, and that the company had at times paid him for his trips to and from the job site. She did not know whether her husband had been paid mileage upon these occasions or whether he had merely been paid for his time.

██ Standing alone and unexplained, the "Termination & Time Order" and the voucher that was attached to the deceased's final pay check are not reasonably susceptible of any construction other than that the ten hours for which the deceased was allowed pay for the pay period ending December 11, 1954, represented time falling altogether within that pay period; and the propriety of inferring that the ten hours did in fact represent time falling altogether within that pay period is further indicated by the circumstance that the deceased was paid for full seventy hours for the preceding pay period, the one ending December 4, 1954. The instruments, together with other of the evidence, are thought to be sufficient, therefore, to create a fact issue as to whether the ten hours did in truth represent time falling altogether within the pay period ending December 11, 1954, or, as the witness Schoolcraft testified they did, in part represented time the deceased had put in during the preceding or some earlier pay period.

If in fact the ten hours represented time falling altogether within the pay period ending December 11, 1954, they in part necessarily represented time the deceased was to put in after leaving the Jacksonville job site, because, as already stated, he left there on the first day of the pay period, and, up until he left, he had worked only four or four and a half hours that day. And if in part the ten hours represented time that was to be put in by the deceased after leaving the job site, it may be reasonably inferred that the deceased was allowed pay for time that all concerned anticipated he would use in going to his contemplated destination, which was undoubtedly Houston; for not only is there no evidence to show that the deceased was to work an additional five or six hours after leaving the job site, but, considering the hour at which he departed, the distance he was to travel, and the fact that no one could have doubted that he proposed to travel by means of his jeep, the conclusion is inescapable

that all parties concerned must have anticipated that he would put in most, if not all, of the remaining working-hours of that day traveling, and the evidence will not support an inference that his term of employment was to extend beyond that day.

Arrived at the conclusion that the evidence will support an inference that the deceased was allowed pay for time that all concerned anticipated he would use in going to his contemplated destination, and assuming this destination to have been his home in Houston (as must be done in fully appraising the rights of the parties), we are next confronted with the question of whether the circumstance that he was allowed pay on the suggested basis (if in fact he was), the circumstance that he was actually en route to his contemplated destination, and the circumstance that he received his injuries during the period of time for which he was allowed pay are together sufficient to support both an inference that he was still in the employ of Brown & Root, Inc., when the accident happened and an inference that he was at such time acting in the course and scope of his employment.

No Texas case that is decisive of the question has come to our attention, but, having in mind that our courts have uniformly recognized that the Workmen's Compensation Act is to be liberally construed in favor of claimants, we conclude, both on reason and on what appears to be the weight of authority elsewhere, that the question should be answered in the affirmative, even though it is well established that even an undisputed employee is not ordinarily to be considered in the course of his employment while merely going to and from his place of work.

Essentially the question we have posed was before the Supreme Court of California in Kobe v. Industrial Accident Commission, 215 P.2d 736, 737, wherein, because they were being paid for their time while en route, employees who were injured while en route home from work were allowed to recover. The element of final termination of the employer-employee relationship was lacking in the case, it is true, but the element of temporary termination of the relationship must be treated as having been involved, because the court stated that the rule that one is not ordinarily in the course of one's employment while going to and from work is based "on the theory that ordinarily the employment relationship is suspended from the time the employee leaves his work to go home until he resumes his work." We quote from the opinion the following:

"It is the general rule that injuries sustained by an employee going to or returning from work are not compensable under the Workmen's Compensation Act. Labor Code, § 3201 et seq. The rule is premised on the theory that ordinarily the employment relationship is suspended from the time the employee leaves his work to go home until he resumes his work. California Casualty Indemnity Exchange v. Industrial Accident Comm., 21 Cal.2d 751, 753, 754, 135 P.2d 158. However, the employer may agree, either expressly or impliedly, that the relationship shall continue during the period of 'going and coming,' in which case the employee is entitled to the protection of the act during that period. Such an agreement may be inferred from the fact that the employer furnishes transportation to and from work as an incident of the employment. [Authorities.] It seems equally clear that such an agreement may also be inferred from the fact that the employer compensates the employee for the time consumed in traveling to and from work.

\* \* \* \* \* \*

"We conclude that where, as in the present cases, the employer pays the employee a specified amount to cover the time required to travel to and from work, it is a permissible inference that the employer has agreed that the employment relationship shall commence at the time the employee leaves his home and continue until his return. Under such circumstances, the

perils of the journey may properly be regarded as the hazards of the employment against which the employee is entitled to be protected by the Workmen's Compensation Act."

The following additional authorities are of similar import: Western Pipe & Steel Co. of California v. Industrial Accident Comm., 49 Cal.App.2d 108, 121 P.2d 35; Voehl v. Indemnity Ins. Co., 288 U.S. 162, 53 S.Ct. 380, 77 L.Ed. 676, 87 A.L.R. 245; Cardillo v. Liberty Mut. Ins. Co., 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028; 58 Am. Jur. 726, sec. 219; a majority of the cases annotated in 87 A.L.R. 250. And since the like California rule was referred to by way of argument in the case from which we have quoted, the Kobe case, we add, in passing, that it is well established in this state that injuries that are sustained by an employee while he is going to or from work by means of transportation that the employer has supplied pursuant to the contract of employment may be considered as arising out of and in the course of the employment. Western Indemnity Co. v. Leonard, Tex.Com.App., 248 S.W. 655; Watts v. Continental Cas. Co., Tex.Com. App., 18 S.W.2d 591.

It follows from what has been said that the evidence raised fact issues for the jury regarding both the matter of whether the employer-employee relationship existed at the time of the accident and the matter of whether, if the relationship did exist, the deceased's injuries arose out of and in the course of such employment. The trial court did not err, therefore, either in overruling appellant's motion for directed verdict or in overruling appellant's motion for judgment non obstante veredicto; and such of appellant's points of error as complain of those rulings are overruled.

■ It does not appear, however, that the theory we have discussed was the one on which the plaintiffs primarily relied. On the contrary, it is rather apparent from the record that the primary theory on which they tried the case was that at the time of the accident the deceased either was on his way to another of Brown & Root's job sites or else was on his way to the company's home office in Houston for assignment to another of the company's jobs, and in either event was acting pursuant to the company's instructions and was being paid by the company for his time while en route. The theory we have discussed was but an alternative theory, and it may even not have been first among these, for the plaintiffs probably sought also to prove that the deceased, if not on his way to another job site and if not on his way to the home office for a new assignment, was nevertheless on his way to the home office for the purpose of delivering something for the company. It is necessary, therefore, that we appraise the record in the light of these other theories.

We hold that there was no evidence to justify submission of the case to the jury on either of them. Without the testimony of Dr. Dameron, there was no evidence tending to show that the deceased either had been or was about to be transferred to another of Brown & Root's jobs, and we are of the opinion that such of the doctor's testimony as may have tended to show a transfer or a prospective transfer was, for reasons presently to be stated, inadmissible and of no probative value. The remaining evidence was fully as consistent with the theory that the deceased was merely on his way home as with the theory that he was on his way to a new job site or to the company's home office, and even more so. It was without probative value, therefore, as evidence on which to predicate either a finding that the deceased was en route to another of Brown & Root's job sites or a finding that he was en route to the home office for a new job assignment or for any other purpose. Perren v. Baker Hotel of Dallas, Tex.Civ.App., 228 S.W.2d 311, 317; Metropolitan Casualty Insurance Co. v. Woody, Tex.Civ.App., 80 S.W.2d 771, 773; Green v. Texas & Pacific Ry. Co., Tex. Com.App., 125 Tex. 168, 81 S.W.2d 669, 673. The fact that the deceased was trans

porting gasoline that had been supplied by Brown & Root, Inc., if he was, does not alter the situation, for there was no suggestion in the evidence that he was expected to return the gasoline to the company or to deliver it anywhere for the company or that he entertained any thought of doing either.

■ Dr. Dameron's testimony regarding what the deceased told him about a transfer was inadmissible because it was hearsay that did not fall within any of the recognized exceptions to the hearsay rule. The statements of the deceased lacked the requisite spontaneity or impulsiveness to qualify as spontaneous exclamations or as a part of the res gestae, even though it be conceded that in the circumstances the considerable time that elapsed between occurrence of the accident and the making of the statements would not of itself necessarily keep them from qualifying. They just were not such statements as can reasonably be considered as having been impulsively or instinctively made as a result of the accident and the consequent shock to the deceased. In other words, neither the accident nor the deceased's resulting condition reasonably accounts, in a manner calculated to clothe the statements with greater than ordinary dignity, for the deceased's discourse on where and for whom he had been working and on the business circumstances attending his movements. We think it was necessary that they do so if the doctor's testimony was to be admissible. See Dewalt v. Houston, E. & W. T. Ry. Co., 22 Tex.Civ.App. 403, 55 S.W. 534; Pecos & N. T. Ry. Co. v. McMeans, Tex.Civ.App., 188 S.W. 692; Texas Law of Evidence (McCormick & Ray), 1st ed., sec. 427, p. 544; Wigmore on Evidence, 3rd ed., sec. 1749, p. 139. The trial court erred, therefore, in overruling the defendant's objections to the evidence, and we think the error was such a one as was calculated to, and probably did, affect the defendant's rights adversely. We accordingly sustain appellant's point twelve.

■ To the extent it was introduced for the purpose of proving the truth of the deceased's assertion, Dr. Dameron's testimony to the effect that the deceased represented the man whom he requested the doctor to call to be his foreman was also hearsay. The inadmissibility of the evidence is not as clear as was true of the evidence already discussed, but we have nevertheless concluded that it was inadmissible. Appellant's thirteenth point is accordingly sustained.

■ Appellant's fourteenth point, which complains of the admission of Dr. Dameron's testimony regarding the deceased's request that his wife be called, presents no error and is overruled. The evidence was not hearsay, because not offered to prove the truth of the deceased's assertions, but in any event it does not appear to have worked any harm to appellant.

As previously stated, the only special issue that was submitted to the jury inquired whether "the injuries of Robert W. Coleman * * * were sustained by him in the course of his employment for Brown & Root, Inc." The defendant urged the following objections:

"Defendant objects to Special Issue No. 1 because it is multifarious and submits more than one ultimate issue of fact in the one question in that the court inquires of whether the deceased sustained an injury which had to do with and originated in the business of the employer, whether it was received by the deceased while engaged in the furtherance of the affairs or business of the employer and whether he was an employee of Brown & Root, Inc., at the time. Each of these inquiries is an ultimate issue of fact to be determined by the jury in separate and distinct questions to which this defendant is entitled to have the jury make separate and distinct findings. Furthermore, the court comments on the weight of the evidence in such issue by assuming and so informing the jury that he is of the opinion that Robert W. Coleman

was an employee of Brown & Root, Inc., at the time in question."

The trial court's action in overruling these objections is complained of in appellant's points ten and eleven; and by its point nine appellant asserts that the judgment is erroneous because rendered without there having been a jury finding that the deceased was in the employ of Brown & Root, Inc., when the accident happened.

While it seems likely that the trial court treated existence of the employer-employee relationship between Brown & Root, Inc., and the deceased as an established fact and intended to submit to the jury only the question of whether the deceased sustained his injuries *in the course of* this assumed employment, we are nevertheless of the opinion that the jury's finding in response to the issue as framed must be construed as an implied finding that the deceased was the company's employee at the time of the accident. And on the strength of such implied finding, we overrule appellant's point nine.

Tht we are of the opinion that both the question of whether the deceased was an employee and the question of whether he sustained his injuries in the course of his employment were embraced in the single special issue that was submitted to the jury is evident, of course, from the holding we have just made. On the evidence adduced, both of these questions were ultimate fact issues for the jury and should have been submitted "distinctly and separately." Rule 277, Texas Rules of Civil Procedure. The defendant's objections on this score should have been sustained, therefore, and appellant's point ten is sustained. Point eleven is also sustained, because the issue as framed was vulnerable to the defendant's objection that it amounted to a comment on the weight of the evidence regarding existence of the employer-employee relationship.

Appellant's points one through nine and its point fourteen are overruled; points ten

through thirteen are sustained; and point fifteen, which complains of the argument of counsel, is not passed upon, since the matter complained of is not likely to occur again during another trial.

The judgment of the trial court is reversed and the case is remanded for a new trial.